**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                               :
MUSTAFA ZAMEL,                 :
                               :          Civil Action
          Petitioner,          :          No. 07-4453(SDW)
                               :
          v.                   :          **O P I N I O N**
                               :
KEITH STITH, et al.,           :
                               :
          Respondents.         :          November 8, 2007
_____:


**APPEARANCES:**

        PAMELA R. ZIVARI, ESQ.
        127 Main Street
        Hackensack, New Jersey 07601
        Counsel for Petitioner MUSTAFA ZAMEL

        JOHN G. SILBERMANN, JR., ESQ.
        Office of the United States Attorney
        970 Broad Street, Suite 700
        Newark, New Jersey 07102

**Susan D. Wigenton, District Judge**

    On September 17, 2007, Petitioner MUSTAFA ZAMEL (hereinafter

"Petitioner") currently detained at the Hudson County Correctional

Center, South Kearny, New Jersey, filed the instant Petition for a

Writ of Habeas Corpus (hereinafter "Petition") under 28 U.S.C. §

2241, challenging his detention by the Department of Homeland

Security (hereinafter "DHS").[1]  See Docket Entry No. 1.

Petitioner, allegedly, "a native and citizen of Palestine," Pet. ¶

5,[2] asserts that he is being held in custody in violation of 8

U.S.C. § 1231(a)(6), as clarified in Zadvydas v. Davis, 533 U.S.

678 (2001), and the Due Process Clause of the Fifth Amendment, see

---

[1]
The Homeland Security Act of 2002, 6 U.S.C. §§ 101-557, P.L.
107-296, 116 Stat. 2135 (Nov. 25, 2002), created the Bureau of
Citizenship and Immigration Services ("BCIS") within the Department
of Homeland Security. See 6 U.S.C. § 271(a). The Act transferred
the functions of the Commissioner of the Immigration and
Naturalization Service ("INS") to the Director of BCIS, see 6
U.S.C. § 271(b), and abolished INS. See 6 U.S.C. § 291.
Accordingly, DHS replaced INS on March 1, 2003.

[2]
While Petitioner asserts that he is "a native and citizen of
Palestine," this designation is unclear. Palestine existed as a
recognized administrative unit between 1270 and 1516, long before
Petitioner was born, being part of the state currently known as
Egypt. After the Ottoman conquest in 1516, the term "Palestine"
ceased to operate as an official name of any administrative unit,
but remained in popular and semi-official use. In April of 1920,
three years after the Turkish Empire was dissolved, the region
became subject to the rule of the United Kingdom under the so-
called British Mandate rendered by the Allied Supreme Council
during the Sanremo Conference in Sanremo, Italy. On 29 November
1947, the United Nations General Assembly passed Resolution 181, a
plan to resolve the Arab-Jewish conflict by partitioning the
territory into separate Jewish and Arab states and bringing the
Greater Jerusalem area under international control. Following the
1948 Arab-Israeli War, the 1949 Armistice Agreements between Israel
and neighboring Arab states eliminated Palestine even as distinct
territory, since the lands were divided amongst Israel, Egypt,
Syria and Jordan. Consequently, it appears that Petitioner is a
native and citizen of either Israel, or Egypt, or Syria or Jordan.
Since Petitioner's Traverse enters Petitioner's opinion that
Petitioner would not be "accepted by the country of Jordan as
citizen[s]," the Court presumes that Petitioner's origin is from
the territories that remained under Jordan's rule since 1949, that
is, for more than forty years prior to Petitioner's entry into the
United States.

id. Introduction and ¶ 9, and seeks a writ directing Respondents to release Petitioner "from custody upon payment of a reasonable bond," see id., Prayer for Relief, and enjoining Respondents from removing Petitioner from the United States.  See Docket Entry No. 1-3.

On October 24, 2007, following the Court's issuance of an order directing Respondents to answer the Petition, Respondents filed a letter in lieu of their answer (hereinafter "Answer").  See Docket Entry No. 6.  On October 29, 2007, Petitioner filed his traverse (hereinafter "Reply").  See Docket Entry No. 8.

Having thoroughly examined Petitioner's application, Answer and Traverse, this Court denies the Petition for the reasons stated below.

## JURISDICTION

Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless . . . he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  A federal court has subject matter jurisdiction under § 2241(c)(3) if two requirements are satisfied: (1) the petitioner is "in custody" and (2) the custody could be "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); Maleng v. Cook, 490 U.S. 488, 490 (1989).  This Court has subject matter jurisdiction over the instant Petition under § 2241 because Petitioner was detained

within its jurisdiction at the time he filed his Petition and he asserts that his detention is not statutorily authorized and violates his constitutional rights.[3]  See Zadvydas, 533 U.S. at 699.

## BACKGROUND

Petitioner entered the United States on August 6, 1994, holding a visitor's visa.  See Pet. ¶ 5.  Although his visitor's visa expired on February 5, 1995, Petitioner did not return to his country of origin and remained in the United States illegally.  See id. ¶ 6.  After deportation proceedings were initiated against Petitioner, Petitioner elected to accept voluntary removal on June 6, 1996.[4]  See id. ¶ 7.  Under the conditions of voluntary removal, Petitioner was spared from being taken into custody, given his promise to leave the United States.  See Reply at 2.  Petitioner, however, elected to breach his promise for the reasons unstated in the Petition or Traverse.[5]

---

[3]

The Court notes its amazement at Respondents' suggestion that the Court's denial of the Petition on the merits must be equated with the Court's lack of jurisdiction over this matter.  See Answer at 3.

[4]

It appears that Petitioner had one year to execute his voluntary removal.  See Reply at 2.

[5]

While Petitioner asserts that he is currently experiencing "genuine fear of [the Iraqi War, as well as of] returning to his [unspecified] home country, due to the war and unrest in the Middle East [because] the Hamas and Fatah parties[,] which now rule Palestine will brand him a 'collaborator' [since] he lived in the

Supplementing the foregoing, the Petition offers a number of mutually exclusive facts and legal contentions.  Specifically,

1.  Petitioner asserts that he accepted voluntary removal, thus waiving his right to appeal the decision of his Immigration Judge to the Board of Appeals.  See Pet. ¶ 1.  However, Petitioner simultaneously maintains that the Petition is based on the factual findings made by the Board of Immigration Appeals.  See id. ¶ 11.

2.  Petitioner acknowledges that any challenge to an order of removal must be presented by petition for review with the appropriate Circuit Court of Appeals.  See id. ¶ 2.[6]

---

United States for many years," Pet. ¶ 7, 11, this statement fails to explain Petitioner's failure to execute his removal in 1996.  At the time when Petitioner accepted his voluntary removal (1) Petitioner did not live "in the United States for many years," (2) Hamas, an Islamic militant organization, did not hold any official political power, (3) Fatah, an organization that joined the PLO in 1969 and signed the Declaration of Principles, a renunciation of terrorism, in 1993, i.e., three years before Petitioner's acceptance of voluntary removal was not a likely threat to Petitioner, (4) no Iraqi War was in existence in 1996, and (5) even if this Court is to presume that Petitioner had similar fears in 1996, Petitioner's acceptance of voluntary removal indicates that Petitioner misled his immigration judge of Petitioner's true emotions and intentions when Petitioner sought voluntary removal.

[6]  Any challenge to an order of removal must be presented by petition for review with the appropriate Circuit Court of Appeals, pursuant to Section 106(a)(5) of the REAL ID Act of 2005.  "Under the new judicial review regime imposed by the REAL ID Act, a petition for review is now the sole and exclusive means of judicial review for all orders of removal except those issued pursuant to 8 U.S.C. § 1225(b)(1)."  Bonhometre v. Gonzales, 414 F.3d 442, 445 (3d Cir. 2005); see also 8 U.S.C. § 1252(a)(5) (1999 & Suppl. 2005).

Nonetheless, all substantive challenges mastered by Petitioner are limited to the statements challenging his order of removal. <u>See</u> <u>id.</u> ¶ 7. Moreover, the Petition is accompanied by an application for enjoining Respondents from removing Petitioner from the United States. <u>See</u> Docket Entry No. 1-3.

3. Petitioner notifies this Court of his intent to appeal his order of removal, <u>i.e.</u>, to challenge the finality of his order of removal. <u>See</u> Pet. ¶ 3. Yet, simultaneously, Petitioner asserts that his instant order of removal should be deemed final during the pendency of that challenge. <u>See</u> <u>id.</u>, Reply at 1.

<b><u>DISCUSSION</u></b>

**I.  <u>Legal Framework</u>**

The "removal period" starts on the latest of the following: (1) the date when the order of removal becomes administratively final; or (2) if the removal order is judicially reviewed and if a court orders a stay of the removal, the date of the court's final order, or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from confinement. <u>See</u> 8 U.S.C. § 1231(a)(1)(B).[7]

_____

[7]

If--during the period of removal triggered by the then-latest of the three above-listed events applicable to a particular alien--the alien is subjected to a qualifying superceding event, such superceding event start the alien's removal period anew. <u>See</u> 8 U.S.C. § 1231(a)(1)(B).

Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.   Detention during the removal period under Section 1231(a)(1)(A) is mandatory and, in addition, § 1231(a)(1)(C) provides that the removal period shall be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).

---

[There cannot] be ["]only one["] removal period[:] . . . that is the only rational reading of the statute. . . . [T]he statute provides that the removal period begins on the latest of several dates.  The passing of one date does not stop the operation of the statute.  In a sense, the only way to apply the statute to a given situation is retrospectively.  That is, the removal period begins when the removal order becomes final.  If a court issues a stay [or a new detention unrelated to removal proceedings takes place], the removal period begins [anew] when the stay is lifted [or when such new detention ends].  Therefore, the only way to determine when the removal period begins, or began, is to look at what events already have occurred.  If there is another potential event, there is another potential beginning date for the removal period.  The only sensible reading of this provision is that [DHS/ICE] is required to effectuate the removal within 90 days of certain events, but will have another 90 days if another one of the designated events occurs at a later date.  The obvious reason for this is that [DHS/ICE]'s authority to effect the removal is suspended due to the occurrence of the later event (such as a stay order [or a new detention on criminal charges]).

Michel v. INS, 119 F. Supp. 2d 485, 498 (M.D. Pa. 2000); accord Morena v. Gonzales, 2005 U.S. Dist. LEXIS 37989, at *18 (M.D. Pa. Oct. 4, 2005); Atkinson v. INS, 2002 U.S. Dist. LEXIS 11335, at *5 (E.D. Pa. June 25, 2002); Marcelus v. INS, 2002 U.S. Dist. LEXIS 795, at *6 (E.D. Pa. Jan. 16, 2002); Dunbar v. Holmes, 2000 U.S. Dist. LEXIS 17048, at *6-7 (E.D. Pa. Nov. 28, 2000).

While, during the "removal period," the alien must be detained, see id. § 1231(a)(2), after the removal period, the government may detain the alien or release him subject to conditions of release. See id. § 1231(a)(6). In Zadvydas, the Supreme Court held that aliens may be detained under § 1231(a)(6) only for "a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689 (holding that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States [and] does not permit *indefinite* detention") (emphasis supplied). Recognizing that its holding would lead to difficult judgment calls in the courts, the Supreme Court, "for the sake of uniform administration in the federal courts" recognized a six-month "presumptively reasonable period of detention." Id. at 700-01. However, coining this "presumptively reasonable period of detention," the Supreme Court stressed that,

> [a]fter this 6-month period, o[nly if] the alien provides
> good reason to believe that there is no significant
> likelihood of removal in the reasonably foreseeable
> future, the Government must respond with evidence
> sufficient to rebut that showing. And for detention to
> remain reasonable, as the period of prior postremoval
> confinement grows, what counts as the "reasonably
> foreseeable future" conversely would have to shrink.
> This 6-month presumption, of course, does not mean that
> every alien not removed must be released after six
> months. To the contrary, an alien may be held in
> confinement until it has been determined that there is no
> significant likelihood of removal in the reasonably
> foreseeable future.

533 U.S. at 701.

Moreover, nothing in the <u>Zadvydas</u> decision limited the tolling-like function enunciated in 8 U.S.C. § 1231(a)(1)(C),[8] that is, the "non-cooperation"-based quasi-tolling which factors out the period of "non-cooperation" from the six months of presumptively reasonable period annunciated in <u>Zadvydas</u>.  <u>Accord</u> <u>Qing Di Wang v. Carbone</u>, 2005 U.S. Dist. LEXIS 24499 (D.N.J. Oct. 17, 2005) (calculating presumptive period excluding the period of non-cooperation and relying on <u>Riley v. Greene</u>, 149 F. Supp. 2d 1256, 1262 (D. Colo. 2001), and <u>Sango-Dema v. District Director</u>, 122 F. Supp. 2d 213, 221 (D. Mass. 2000)).

## II.  <u>Analysis</u>

While the parties appear to be in agreement as to (a) the basic legal concepts outlined above, and (b) the fact that Petitioner's removal period was triggered at a certain point in the past, they are in stark disagreement as to the application of these legal principles and the particular point in time when Petitioner's

---

[8]

Indeed, it would be anomalous that an alien's frustration of government's efforts to remove him would be rewarded with the alien's release from custody if the alien is persistent enough to keep his thwarting activities for a period exceeding <u>Zadvydas</u>' six months. "<u>Zadvydas</u> does not save an alien who fails to provide requested documentation to effectuate his removal.  The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock."  <u>Pelich v. INS</u>, 329 F.3d 1057, 1060 (9th Cir. 2003).

removal period began to run.[9]

Specifically, Respondents contend that, since "Petitioner was issued an order to report for his removal by DHS but failed to comply [Petitioner's] removal period [did] not commence until [P]etitioner came in to government custody on September 13, 2007." Ans. at 2.  Consequently, Respondents conclude that Petitioner's 90-day removal period, as well as the six-month Zadvydas period, is currently running, thus rendering the Petition without merit.

Petitioner, however, maintains that his removal period began at the date of his acceptance of voluntary removal, that is, June 6, 1996, or--at the very latest--at the end of the year that Petitioner had to execute his voluntary removal.  See Reply at 1-2. Consequently, Petitioner concludes that his 90-day removal period, as well as the six-month Zadvydas period, expired about a decade ago.  See id.  Moreover, addressing the issue of 8 U.S.C. §

---

[9]

The Court has deep concern about the good faith of Petitioner's instant Petition.  Since (a) Petitioner unambiguously indicated his intent to challenge his order of removal, see Pet. ¶¶ 3, 10; (b) Petitioner's filing of such challenge to his order of removal, upon issuance of a stay, would render his currently existing order of removal not final for the purposes of Section 1231(a)(1)(B) and, hence, delay the triggering of his next removal period until the resolution of his challenge and legitimately place Petitioner in custody for many months--if not years--to come, see Michel, 119 F. Supp. 2d at 498; Morena, 2005 U.S. Dist. LEXIS 37989, at *18; Atkinson, 2002 U.S. Dist. LEXIS 11335, at *5; Marcelus, 2002 U.S. Dist. LEXIS 795, at *6, yet (c) Petitioner seeks his release from current custody on the grounds that his period of removal has expired because, as of now, Petitioner has not challenged his order of removal, see Reply at 1-2, it appears that Petitioner's strategy is to use the instant Petition merely as a "test vehicle."

1231(a)(1)(C), Petitioner asserts that the tolling of the removal period applicable to "the alien [who] fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal" is inapplicable to Petitioner because there is:

> nothing in the plain language of 8 U.S.C. § 1231(a)(1)(C) to back up [Respondents' reliance on this provision]. Nowhere in the statute does Congress say that there are any circumstances under which the 90-day removal period starts counting from the date on which the alien is taken into federal custody.  If Congress had intended the 90-day removal period to commence when the alien was taken into federal custody, it would have said so.

Reply at 2.

The Court agrees with Petitioner that the language of Respondents' Answer presents very sloppily phrased legal argument. The Court, however, disagrees with Petitioner that Section § 1231(a)(1)(C) is inapplicable to the case at bar.  The Subsection (C) provides that the tolling applies during the time when "the alien . . . acts [in a fashion that] prevent[s] the alien's removal [in violation of his/her] order of removal.  8 U.S.C. § 1231(a)(1)(C).  One can hardly think of a more striking example of an act preventing the alien's removal than the alien's breach of obligation to execute his/her self-removal.  Had it been otherwise, any alien granted an order of voluntary removal would (a) be able to avoid custody by simply electing not to execute his/her self-

removal for the period allowed for such removal, plus six months,[10] accord Pelich, 329 F.3d at 1060 (noting that the period of time from the triggering of removal period to the point when the alien files his/her § 2241 petition is of little relevance if the alien "controls the clock"); and (b) force the DHS to act not only as a monitoring agency supervising and verifying all voluntary removals but, in addition, as a de facto bounty-hunter tracking every alien who elected not to effectuate his/her voluntary removal. However, the very nature of the grant of voluntary removal is such that the alien is trusted to execute his/her removal, and requires no supervision or bounty-hunting.[11]

---

[10]

The Court notes, in passing, that--in a voluntary removal scenario--an alien's 8 U.S.C. § 1231 removal period is triggered upon expiration of time allowed for voluntary removal.   See 8 C.F.R. § 1241.1(f).

Petitioner's reading of the statute allows any alien to avoid custody and removal by merely electing to breach the obligation to remove himself/herself from the United States.  The legal regime of 8 U.S.C. § 1231, however, is not based on what an alien elects to do.  According to 8 U.S.C. § 1231(a)(1)(A), 90 days is the period during which the Attorney General has to remove the alien from the United States rather than the period during which the alien must avoid his/her removal.

[11]

8 U.S.C. § 1229c(b)(1) sets forth the general conditions that must be met for an alien to qualify for voluntary departure. It states as follows:

> The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if . . . the immigration judge . . . finds that-- . . .
> (B)  *the alien is, and has been, a person of good moral character* for at least 5 years immediately preceding the alien's application for voluntary departure;

Hence, Petitioner's creative "plain language" reading of the statute leads to an anomalous outcome and has to be rejected.  See United States v. Brown, 333 U.S. 18, 27 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences").  The Court concludes that, for the purposes of Sections 1231(a)(1)(B) and (C), the removal period in a scenario where an alien is granted voluntary departure is simultaneously triggered *and* tolled on the day of expiration of the period allowed for voluntary removal, and the 90-day period does not re-start until *the Attorney General, assisted*

_____

> . . . and
> (D) *the alien has established by clear and convincing evidence that the alien* has the means to depart the United States and *intends to do so.*

8 U.S.C. § 1229c(b)(1) (emphasis supplied).

> Voluntary departure is [a privilege] that the immigration service may grant in its discretion.  An alien who has been granted this privilege is entitled to leave the country at her own expense within a certain period of time (usually up to 60 days). . . . For aliens, voluntary departure is desirable because it allows them to choose their own destination points, to put their affairs in order without fear of being taken into custody at any time, to avoid the stigma and various penalties associated with forced removals (including extended detention while the government procures the necessary travel documents and ineligibility for readmission for a period of five or ten years), and it facilitates the possibility of return to the United States, for example, by adjustment of status.

Lopez-Chavez v. Ashcroft, 383 F.3d 650, 651 (7th Cir. 2004) (citations omitted); see also Iouri v. Ashcroft, 487 F.3d 76, 82-83 (2d Cir. 2007) (describing benefits of voluntary departure).

*by the alien*, gets a *reasonable opportunity* to effectuate the removal.[12]

In the case at bar, the Petition does not assert that the Attorney General had a reasonable opportunity to effectuate Petitioner's removal until Petitioner was taken in DHS' custody on September 13, 2007. <u>See</u> <u>generally</u>, Pet. Therefore, this Court finds that both Petitioner's 90-day removal period and six-month <u>Zadvydas</u> period have been tolled, at the very least, until September 13, 2007. Consequently, at the instant juncture, Petitioner's detention is lawful and does not require an inquiry into the issue of whether Petitioner's removal to Jordan or any other country is reasonably foreseeable. <u>See</u> <u>Zadvydas</u>, ("*After this 6-month period, o[nly if]* the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing").

<u>**CONCLUSION**</u>

For the foregoing reasons, Petitioner's application for a writ

---

[12]

Hence, if--right from the very first moment of his DHS custody--Petitioner has been refusing to cooperate with authorities in their attempts to remove Petitioner, Petitioner's period of removal is still being tolled, and neither his 90-days nor his <u>Zadvydas</u> period would start running *until he actually begins cooperating in good faith with the authorities*.

Page -14-

of habeas corpus under § 2241 will be denied.[13]  An appropriate

Order accompanies this Opinion.


                                      S/SUSAN D. WIGENTON
                            United States District Judge

---

[13]

    This Court notes that Petitioner is free to file another §
2241 petition should, upon expiration of his Zadvydas period,
Petitioner develop good evidence that his removal is not reasonably
foreseeable.  The Court, however (a) cautions Petitioner against
umbrella-type conclusory statements based on the legal concepts of
jus solis ("the law of the place," referring to the acquisition of
nationality by birth within a nation's territory) and jus sanguinis
("the law of blood," referring to a nation's extension of
nationality to its nationals' foreign-born children), see Reply at
2-3 (entering such an umbrella-type claim by alleging that a
"Palestinian" cannot even be deemed a citizen of Jordan or any
other Middle Eastern country); compare Suzanne Gershowitz,
Roadblock to Peace, The New York Sun 7 (Nov. 14, 2005) (observing
that most Palestinians actually became citizens of Jordan); and (b)
reminds Petitioner that, for the purposes of a Section 1231
inquiry, an alien's citizenship in country "X" is not a necessary
pre-requisite to the alien's removal to country "X."